STATE, JOHN KEAN ET AL., PROSECUTORS, v. DRIGGS
DRAINAGE COMPANY.

1. The act entitled "An act to authorize the drainage of marsh and swamp lands" (*Pamph. L.*, 1870, *p.* 815,) is unconstitutional.

    1. It commits to a private corporation, thereby created, the right to elect whether it will drain lands without the consent of the land-owners and at their expense.

    2. The enterprise is of the nature of a private venture for private emolument, and does not justify the exercise of the state's right of taxation or eminent domain.

    3. The act does not restrict the aggregate of the assessments which are to be levied on the land-owners to the amount of benefit to be conferred by the proposed work.

2. If the act could be regarded as constitutional, to entitle a contract under it to approval, the company must first establish itself in the position of pecuniary responsibility contemplated by the act, by requiring the shareholders to pay for the shares subscribed for in cash, or in authorized property at its fair, actual value.

On *certiorari*.

Argued at November Term, 1882, before Justices DEPUE, VAN SYCKEL and PARKER.

For the plaintiffs, *J. W. Taylor*.

For the defendants, *C. Parker*.

The opinion of the court was delivered by

VAN SYCKEL, J.   The controversy in this case relates to an order appointing commissioners, and a contract entered into by former commissioners with the Driggs Drainage Company, which purport to have been made by authority of the act entitled, " An act to authorize the drainage of marsh and swamp lands," approved March 17th, 1870.   *Pamph. L., p.* 815.

The prosecutors challenge the validity of the act upon which the certified proceedings are based.

The first five sections of the act provide for the incorporation of the Driggs Drainage Company, with a capital of $1,000,000, with power to increase it to $5,000,000, and regulate it powers, &c.

The sixth section enacts " that the said company, from time to time, as shall appear expedient, may reclaim and drain all or any portion or portions of the wet or overflowed lands and tide-water marshes in Essex, Union and Middlesex counties, in the State of New Jersey, and may receive an annual compensation therefor in the manner hereinafter provided; and said company may construct, maintain and use all dikes, dams, ditches, drains, sluices, engines, pumps, and other works, structures or machinery necessary or convenient thereunto."

The eighth section provides for the appointment by a justice of the Supreme Court of three commissioners in respect to all such lands so undertaken to be drained.

The ninth section gives such commissioners the right to contract with said company for the complete drainage of said lands, and for the maintenance of the same, and directs that said commissioners shall pay said company such compensation therefor as said contracts shall respectively specify.

The tenth section directs that when the lands shall have been reclaimed, or at any time before the work is completed, the said commissioners shall assess upon the same a just pro-

portion of the contract price and of the expenses of said commission, and cause the same to be collected, and shall pay the stipulated compensation to said company; and for the purpose of paying the annual compensation for maintaining the same, shall assess upon the lands so reclaimed a just proportion of the aforesaid annual compensation and the expenses of the commissioners, and shall cause the same to be collected annually, and shall pay the same yearly to the said company, and the compensation to be paid for the first or original drainage shall be in like manner assessed upon the lands benefited thereby, and made payable forthwith, or with interest in equal annual instalments, during such term of years as in the contract in that behalf shall be specified; provided, however, if said company shall fail to keep dry any portion of said lands drained, so as to be fit for occupancy and use, said company shall not collect, or cause to be collected, any tax upon such portion of said lands in the year or years when such failure shall happen; and provided further, that the amount of tax assessed on the said lands so reclaimed shall in no case exceed the benefit.

The fourteenth section provides "that the president and directors of the said company shall, within one year after the reclaiming of said lands shall have been completed, declare and make such dividends as they think prudent and proper of the net proceeds thereof, and shall in like manner annually thereafter declare and make such dividends, and pay the same to the stockholders of the said company in proportion to the amount of shares held by them respectively, as they may deem prudent and proper."

The proceedings taken under legislative authority to impose assessments upon lands, which have hitherto received judicial sanction in this state, are the following:

1. Assessments for general taxes for the support of government.

2. Assessments laid for street improvements and sewers, under powers committed to local governments, in which the imposition must be limited to the supposed benefit conferred.

3. Assessments under the Meadow act, where the proceedings are instituted and conducted by the owners of the lands to be improved.

4. Assessments made under the Meadow act, where the improvements are made under the direction of the geological board, but the proceedings must be instituted on the petition of at least five of the land-owners.

In the two last-mentioned instances the entire cost of the work, without regard to the resulting benefits, is lawfully imposed upon the lands to be drained. These cases constitute a class by themselves, to which the rule in Agens' case has no application. In that case the project was a public one, from the execution of which a benefit was derived by the public as well as by individual citizens, while in these cases of meadow drainage the benefit is presumed to be entirely private, and none of it is, therefore, chargeable to the public. *In the matter of drainage along Pequest river*, 12 *Vroom* 175.

In *Pequest Drainage Case*, 12 *Vroom* 181, the Chief Justice says " that the entire system of meadow drainage must rest on the foundation of inveterate usage, and from its nature, therefore, is not susceptible of essential modification."

In *Pequest Case*, 12 *Vroom* 175, and *Tidewater Company* v. *Coster*, 3 *C. E. Green* 518, the distinction is clearly drawn between meadow drainage for the exclusive benefit of the owners, to be done at their sole expense, and drainage undertaken by the public primarily as a matter of public concern, in which case the assessment upon land-owners must be limited to benefits imparted.

The act which gives rise to this contention differs from the Meadow act in the material respect that there the work is promoted exclusively for the benefit of the land-owners, and cannot be undertaken except upon application of some of the land-owners to be affected by it. Here an artificial person created by the act, having no interest in the scheme, other than what it can make out of its execution, is vested with full power to initiate the proceedings without the consent of those most deeply concerned in it. It is an intervention by the

state, through the exercise of its power to tax, and its eminent domain, to be justified only by public necessity or convenience.

Such was held to be the character of the proceeding under an act similar, in some respects, to this in *Tidewater Case*, 3 *C. E. Green* 518. There the salutary rule was applied that the act was void in that it did not limit the assessment to be imposed to the extent of the benefits conferred on the land-owner.

While this scheme for reclamation of the prosecutors' lands is clearly included in that class of cases to which this rule, with regard to the amount of the assessment, is applicable, it contains peculiar features which make it an advanced step in legislation in this state.

The land-owners have no voice in determining whether the work shall be promoted, and no control over its execution. The legislature has not declared that these lands, or any of them, shall be drained, and constituted agencies upon which shall fall the duty of performing the work, nor has it committed to any local government the power to decide, as in municipal improvements, that the work shall be done. Whether any of the lands within the designated area shall be reclaimed, and what part or proportion of them, is left by the act to the election of the company thereby created. To this is superadded the authority to the company to make annual dividends out of the profits of the scheme, which will unquestionably be the primary object in enforcing it.

The construction of sewers and the paving of streets are committed to municipal bodies, or political districts entrusted with certain powers of local government, controlled and directed by persons presumably actuated by a desire to promote the public and not their own private interest. Here a private company selects the lands upon which it will operate, impelled by the single incentive of making dividends for its stockholders. In appropriating private property, under the state's right of eminent domain, for railroads and canals, compensation must be first made to the land-owner. The lands

taken must be paid for. But here a license is given to a private corporation to elect whether it will improve the lands of certain citizens, without their consent, and to charge them with the value of benefits supposed to be imparted to such lands. It is true that a check is imposed on the company in requiring the consent of the commission, appointed under the act, to the contract and the contract price, but nevertheless the company is the actor, and such lands only can be drained as the company shall offer to reclaim. If this act is within the sphere of sound legislation, it may be extended to any other lands in the state with respect to any other class of improvements deemed by the legislature to partake of a public character. Thus, practically, there would be no limit to the extent and variety of corporation devices for improving the lands of others, which would stand upon the statute-book a perpetual menace to the security of the titles by which lands in this state are presumed to be held.

The right to assess lands for supposed benefits conferred upon them has been so pernicious in its effect that it should be held strictly within the limits hitherto recognized by the adjudications.

The march of such improvement is marked by the bankruptcy of cities and the confiscation of individual property. Lands taken under legislative authority for water-works and mill sites, and purposes of a kindred character, must be paid for before the owner can be deprived of them.

The doctrine of compensation to the owner through an increase of value supposed to be impressed upon his property, has hitherto been restricted to the case of sewers and street improvements. Within that limit the rule has its foundation in repeated judicial recognition rather than in sound reason.

The case submitted is novel and within none of the recognized classes. The peculiarities pointed out impress this project so clearly with the character of a private venture for private emolument, that the act must be pronounced to be in contravention of constitutional restraints.

In another material respect this charter grants a wider power than that contained in the Tidewater act.

On the 18th of September, 1870, the commissioners contracted with said defendant company to drain six thousand three hundred and seventy-five acres of land for the sum of $860,625, being at the rate of $135 per acre.

This sum may be assessed upon the said lands after the reclaiming of the lands, or before the work of reclamation is finished, if the commissioners deem it proper to do so. In addition to this the annual cost of maintaining and perfecting said system of drainage by said company is to be assessed by said commissioners annually on said lands, and paid to the company.

The only limitation provided is "that the amount of tax assessed on the said lands so reclaimed shall in no case exceed the benefit."

It is manifest that the system of drainage contemplated by this act will involve not only the outlay of this large sum of money in its original construction, but to make it effective and maintain it will require large annual expenditures. Time alone can prove the efficiency of the system. That which promises to be a success may prove to be abortive and lead to the necessity for a new outlay for construction, or the total abandonment of the scheme.

For such a contingency the act provides no security to the land-owner against illegal assessment, and is obnoxious to the objection which arrested the execution of the tidewater plan.

The act, after providing for the laying and collection of an original assessment for the entire cost of the system, authorizes annual assessments for work annually bestowed upon it thereafter, without the restriction that the aggregate of assessments shall not exceed the benefits derived by the landowners. The limitation is that in no case shall the tax exceed the benefit. After the original cost has been charged upon the lands and paid, a further assessment for the work of a subsequent year might be imposed to the extent of the benefit imparted by that work, although the two assessments together

exceeded the benefit. So long as the amount levied from the land-owner is not greater than the benefit flowing from the work done since the next preceding assessment, there is no violation of the provision that the tax in no case shall exceed the benefit. This objection is not met by saying that the courts should not declare the law to be unconstitutional, but that the remedy will be to stay the collection of any assessment after the limit of the benefit has been reached.

No means are provided for liquidating the cost of maintaining and perfecting the drainage system from year to year except the right to assess. If, after the prosecutors have been practically deprived of their possessions by the enforced payment at the rate of $135 per acre for having them improved, they refuse at any time afterwards to submit to the annual exactions of the grasping hand of this speculative device, the drainage would be abandoned and they would be remediless. Thus their condition would be worse than if their lands had been confiscated in the first instance. It cannot justly be presumed that the aggregated expenses for years will not exceed the benefits. If they do, no funds are provided to prevent the system from falling into decay. It is apparent that damages to such a comprehensive system of reclamation, through the action of the elements, the defects of imperfect construction, and mistakes in the plans adopted must lead to very heavy expenditures. The legislative scheme is imperfect; it enables the promoters to abandon the enterprise and permit the work to become absolutely futile after they have constrained the land-owners unwillingly to pay for it.

It is indisputable that where the legislature has organized a special body for a specific public work, the cost of which is to be raised in a manner expressly pointed out, and that manner is found to be unconstitutional, and no other lawful means of defraying the expenses exist, the right of the body to act fails and its proceedings will be set aside. *State, Lydecker, pros.,* v. *Englewood,* 12 *Vroom* 154; *State, Gaines, pros.,* v. *Hudson Comm'rs,* 8 *Vroom* 12; *State, McClosky, pros.,* v. *Chamberlin,*

8 *Vroom* 388; *Coster* v. *Tidewater Company*, 3 *C. E. Green* 518.

The right to make the successive assessments is expressly given in this case, without the essential limitation upon the accumulated burden which may fall on the land-owner. This is not a legal mode of defraying the expenses. No legal mode being provided, the act cannot be upheld.

The contract certified into this court was executed in 1871. Its terms and conditions were adjusted with reference to values at that date. No work has yet been done under it. This long delay should be regarded as such a neglect to comply with the terms of the act as will annul the bargain with the commissioners. The law is of a character so extraordinary and confers powers so susceptible of abuse to the oppression of land-owners, that in applying it the company should be held to the strictest responsibility. If the validity of this charter can be maintained, it seems quite clear that it will be the duty of the company to put itself in a condition of pecuniary responsibility to exercise the granted privileges by requiring its stockholders to pay in their stock subscriptions, either in cash or in such property as the act specifies, taken at its fair actual valuation. The legislature could not have intended that an irresponsible body, without the pecuniary ability to execute the work, should be permitted to put the provisions of this act into operation. Its capital stock is not to be less than $1,000,000.

Mere liability to pay instalments on the shares should not be deemed an adequate protection to land-owners; the shareholders may be insolvent.

To entitle a contract to approval, the company must first establish itself in the position contemplated by the act.

The proceedings certified should, in my opinion, be set aside.